BOROUGH OF ROSELLE PARK ET AL., PROSECUTORS, v. BOARD OF PUBLIC UTILITY COMMISSIONERS, PUBLIC SERVICE RAILWAY COMPANY AND PUBLIC SERVICE TRANSPORTATION COMPANY, RESPONDENTS.

Argued January 17, 1928—Decided January 31, 1929.

Before Justices MINTURN, BLACK and CAMPBELL.

For the prosecutors, *Charles H. Stewart, Martin P. O'Connor* and *Herrigel, Lindabury & Herrigel.*

· For the respondents, *William H. Speer* and *John O. Bigelow.*

PER CURIAM.

On December 14th, 1926, the Public Service Railway Company and the Public Service Transporttaion Company, filed with the board of public utility commissioners a joint petition which sets forth: that the Public Service Railway Company operates a system of street railways in one hundred and thirty-two municipalities of the state; that the Public Service Transportation Company operates a system of auto buses in the same general territory as the railway company; that all stock of both companies, except that necessary to qualify directors is owned by the Public Service Corporation of New Jersey and the management of both companies is the same and they are allied and affiliated and they are endeavoring to furnish a system of street railway and bus transportation so co-ordinated as to provide a maximum of efficiency at a minimum of cost.

The petition further gives an historical narration of the fare increase question and the financial difficulties of the railway company caused by increased cost of labor, &c., covering the period from 1918 forward, which is concluded as follows:

"Public Service Railway Company and Public Service Transportation Company seek the co-operation of the public and of the public authorities to achieve the objects herein set forth and to enable them to provide the best possible service for those who use their cars and buses. They have not hesitated to carry out their full duty. They have assumed losses that run into the millions and have, under circumstances that would have discouraged other investors, put millions of new capital into the business in order to provide adequate and comprehensive service. But these companies cannot do the impossible; they cannot continue to provide transportation at

less than cost nor can they give proper co-ordinated service without full co-operation on the part of the public authorities."

Then follows what is, in fact, the prayer of the petition in the following language:

"The companies therefore at this time apply to the board for an adjustment of fare zones to enable the companies to maintain proper service and co-ordinate street railway and bus service where they are operated in the same territory."

Then there are set forth seven districts wherein, it is said, there are zone discrepancies requiring re-adjustment.

We are here only concerned with three of these and they are described in the petition as follows:

"1. Clinton avenue, Clinton Place, Springfield avenue and Lyons avenue bus lines operating from Newark to Irvington. The bus fare is five cents for the entire route. The street railway ride is divided into two five-cent fare zones, one in the city of Newark and the second after crossing the Irvington line. The bus zone should be changed so that the fare would be five cents within the city of Newark and five cents within the town of Irvington."

"3. Roselle Park bus route operates from Elizabeth to Roselle Park. The bus fare is five cents for the entire ride. The street railway ride is divided into two five-cent zones; five cents in the city of Elizabeth and a second five cents in Roselle Park. The bus zone should be changed so that the limits would be the same as on the street railway; five cents in the city of Elizabeth and a second five cents in Roselle Park."

"4. The Kenilworth bus route operates from Elizabeth, through Roselle Park into Kenilworth. The first five cents includes Elizabeth and Roselle Park while the second five cents extends from Roselle Park to Kenilworth. This bus line should be re-zoned into three five-cent zones; the first to cover that portion of the route within the city of Elizabeth, the second to cover the portion of the route within the borough of Roselle Park and the third from the northerly boundary line of Roselle Park into Kenilworth."

The petition concludes with a schedule of rates, effective January 1st, 1927. Of such rates six are upon the part of the

Public Service Transportation Company, and one on the part of the Public Service Railway Company.

The first, second and third of these upon the part of the transportation company are the only ones affecting the matters before us. They are:

"1. A five-cent fare for a single ride within the city of Newark on the Clinton avenue, Clinton Place, Springfield avenue, Lyons avenue and Bloomfield bus lines and five cents beyond.

"2. A five-cent fare for a single ride within the limits of the city of Elizabeth on the Roselle Park bus line and five cents in Roselle Park.

"3. A five-cent fare for a single ride within the city of Elizabeth on the Kenilworth bus line; within the borough of Roselle Park five cents and from the northerly boundary line of Roselle Park, into Kenilworth, five cents."

It will be seen that whether the re-zoning permission applied for was granted or the new rate schedule became effective the result would be the same and that result would be that the rates of fare by trolley and bus would be identical.

Whether this is a rate case or simply a co-ordinating of zones case appears to have been a matter calling for considerable attention by the contending counsel at both the oral argument and in their briefs. Whether it was both, or one or the other, we deem of no importance in reaching our conclusion.

Upon the filing of this petition the board of public utility commissioners fixed January 19th, 1927, for the hearing thereof, and suspended the operation of the schedule of increased fares for three months.

These hearings continued to June 1st, 1927, resulting in the taking of testimony, covering nearly thirteen hundred printed pages and a great number of exhibits.

At the conclusion of the hearings the board took the matter under advisement, the rate schedule in the meantime being suspended, and on August 4th, 1927, filed its conclusions and the order under review, which became effective August 14th, 1927.

The board did not by its order permit the adjustment of the zones of the trolley and bus routes in exact accordance with the prayer of the petition.

In its decision it says:

"With respect to the Newark-Irvington routes it appears that the Springfield avenue route and the Clinton avenue route leave the center of Newark and meet at Irvington center, the Springfield route continuing on to Forty-third street and Springfield avenue, and the Clinton avenue route diverging at Ball street, Irvington, and arriving at the junction of Fortieth street and Stuyvesant avenue, returning by way of Clinton avenue to Irvington center. At present the railway lines have their fare zone at the Newark city line, a distance of approximately one-third of a mile east of Irvington center. The evidence does not demonstrate that either of the foregoing routes serve any common point of distribution at the Newark city line. This point was originally adopted for the trolley fare zone somewhat as an arbitrary point in the plan of installing a uniform five-cent fare as heretofore indicated. There is no question but that Irvington center is a common loading and distribution point for both buses and trolleys that operate over both of these routes. It will be in the public interest to the citizens of Irvington to have both buses and trolleys establish the fare zone at Irvington center. At the present time the trolley does little business between Irvington center and Newark city line due to the very short distance that would require an extra fare for those desiring to use the trolley to the center of Newark. To establish the fare zone at Irvington center for both buses and trolleys will equalize the service and fares and will offer a better service to the public."

Accordingly the board by its order directed as follows:

"1. Clinton avenue bus route. That the Public Service Transportation Company shall establish the first fare zone limit on its Clinton avenue bus route at the intersection of Clinton avenue and Springfield avenue, in the town of Irvington, commonly known as Irvington center, on eastbound trips and at Clinton avenue and Ball street on westbound trips, thus dividing this line into two five-cent fare zones."

"4. Springfield avenue bus route. That the Public Service Transportation Company shall establish the first fare zone limit on its Springfield avenue bus route at the intersection of Springfield avenue and Clinton avenue in the town of Irvington, commonly known as Irvington center, thus dividing this line into two five-cent fares;" and

"5. Springfield and Broad trolley lines. The Public Service Railway Company shall establish a zone point on what is known as the Broad line, operating in part on Clinton avenue in the city of Newark and the town of Irvington, and on the Springfield line at the intersection of Clinton and Springfield avenues in the town of Irvington.

"This shall be in lieu of the zone point on each of the aforementioned lines now located at the Newark-Irvington city line on Clinton avenue near Twentieth street on the Broad line and on Springfield avenue, between Twentieth and Twenty-first streets on the Springfield line."

Thus the zone limits and the consequent fares of the trolley lines and the bus lines were co-ordinated and equalized. The Springfield and Broad trolley lines and the Clinton avenue and Springfield avenue bus lines each having two zones between Irvington and Newark, such zones as to all four lines being co-extensive and centering in Irvington center, with the rates of fare the same on each.

The opinion of the board proceeds as follows:

"With respect to the Clinton Place bus route and the Lyons avenue bus route, it appears that neither line parallels the route of the trolley in the town of Irvington; that they reach the town of Irvington at points distantly removed from the center and serve a community which could not otherwise be served with facilities having Irvington center as a distribution point. To establish the fare zone as to these lines at the Newark city line would make these two routes about equal in length with the Springfield avenue line and the Clinton avenue line. It appears, however, that the Clinton Place line ends at Kuna Terrace and Chancellor avenue, one block away from the Clinton avenue route, which runs along Chancellor avenue. To establish a zone point at the city line as to this route would make an unusually short second zone. We are of

opinion that the Clinton Place route should be continued along Chancellor avenue to Fortieth street, following the route of the Clinton avenue line and along Fortieth street to the end of the Clinton avenue line thereby substantially lengthening this line and affording better service for patrons of this route. It will be necessary for the town of Irvington to grant to the Public Service Transportation Company upon its application, in order to extend this line, the necessary municipal permit so that the Clinton Place line may be extended as heretofore indicated from Kuna Terrace and Chancellor avenue to Fortieth street and Stuyvesant avenue. The Lyons avenue route has a relatively short zone by establishing a zone point at the city line. The board deems it in the public interest that this line be extended from its present connecting point at Springfield avenue along Springfield avenue to Forty-third street. This likewise will require municipal consent for this extension."

Pursuant to such conclusions the order of the board was: .

"2. Clinton Place bus route. That the Public Service Transportation Company shall establish the first fare zone limit on its Clinton Place bus route at the Newark-Irvington city line, on Chancellor avenue; also that the Public Service Transportation Company shall apply to the town of Irvington for municipal consents to extend its Clinton Place bus route from its present terminus at Chancellor and Union avenues, in the town of Irvington westerly on Chancellor avenue to Fortieth Street, thence southerly on Fortieth street to the intersection of Fortieth street and Stuyvesant avenue, and upon receipt of such consent shall make application to this board for approval of same."

"3. Lyons avenue bus route. That the Public Service Transportation Company shall establish the first fare zone limit on its Lyons avenue bus route at the Newark-Irvington city line on Lyons avenue between Cordier street and Fabyan Place thus dividing its line into two five-cent fare zones; also that the Public Service Transportation Company shall make application to the town of Irvington for municipal consents to extend the Lyons avenue bus route from the present terminus at Springfield avenue and Lyons avenue, on Spring-

field avenue to Forty-third street and upon receipt of such consent shall make application to this board for approval of same."

The result here is that, if the municipal authorities of the town of Irvington co-operate with the board and grant the necessary municipal consents to extend both of these routes, such routes will consist of two zones each, defined by the same line, namely the Newark-Irvington line with a fare both within each municipality and from one into the other of the same amount or rate, with an increased route service in the town of Irvington.

This concludes the findings and the orders of the board so far as the matter before us has any reference to or affects the prosecutors, the town of Irvington and Alice M. Stewart.

As to the matters brought up by the writ at the suit of Roselle Park and Jacob Hergert the finding and conclusions of the board are:

"With respect to the Roselle Park route from Elizabeth to Roselle Park, it appears that at the present time this route extends from what is known as the Bayway section in the easterly end of Elizabeth through the city of Elizabeth to and into Roselle Park a total distance of five and seventy-nine one hundredths miles, all for one five-cent fare, the entire route comprising one zone. It is proposed to divide this line in two zones at the Elizabeth-Roselle city line. This route is paralleled on the same street over a considerable portion of its route by a trolley line. The trolley line comprises two zones, divided at the Elizabeth-Roselle city line. If the zone point of the bus route was established at the city line as prayed for by the petitioner, not only would the fare be equalized on both methods of transportation over this route but a five-cent fare would also be maintained within the city of Elizabeth to the benefit of the greatest number of the patrons of the line. It appears to the board that it is in the public interest through the preservation of the five-cent fare within the city limits of Elizabeth, that the zone point be established on the Roselle Park bus line at the Elizabeth-Roselle city line coincident with the trolley line zone point and it will approve this proposed change."

The judgment of the board upon this matter was expressed in its order as follows:

"8. Roselle Park bus route. That the Public Service Transportation Company shall establish the first fare zone limit on its Roselle Park bus route on Westfield avenue at the Roselle Park-Elizabeth city line, thus dividing this line into two five-cent fare zones."

By this the fare zones and the rates of fare from and to the Bayway section of Elizabeth and Roselle Park were equalized and made the same for both trolley and bus lines.

The remaining matter brought up by the borough of Kenilworth and James Orr, as prosecutors, is treated of in the conclusions of the board as follows:

"With respect to the Kenilworth route through Roselle Park to Kenilworth, this route extends from the city of Elizabeth, serving the general territory served by the Roselle Park line, and also the Elmora section. From this section the route continues along the Roselle Park route to Chestnut street in Roselle Park, thence on to Kenilworth. This route is at present divided into two zones, one including Elizabeth and Roselle Park and the other extending from Roselle Park to the terminal in Kenilworth. It is proposed to divide this route into three zones, one from the Elizabeth terminal to the Elizabeth-Roselle city line, another from this point to the northerly boundary of Roselle Park at Summer street and a third from this point to the terminal at Kenilworth. Coordination with the trolley route is not directly involved in this case, no trolley route extending into Kenilworth, which is that portion of the route where the change in zoning is proposed. From the testimony it appears that the traffic on this line is very light and that more revenue must be obtained in order to maintain the service. The board is of the opinion, however, that in place of establishing the zone point at the Kenilworth-Roselle Park line, this point should be moved slightly further northward to the intersection of Galloping Hill road and Chestnut street. At this point the route also intersects that of an independent operating bus company and it appears in general to be a more logical location for a zone limit."

In accordance with such opinion the order of the board was:

"9. Kenilworth bus route. That the Public Service Transportation Company shall establish on the Kenilworth bus route the following zone points at the intersection of Chestnut street and Galloping Hill road and at the Roselle Park-Elizabeth city line, thus dividing this route into three five-cent fare zones."

Under the three writs of *certiorari* allowed to review the order of the board of public utility commissioners, and which three proceedings were consolidated, there are forty-two reasons for reversal filed in the proceeding by Roselle Park, twenty-three in that of Kenilworth and thirty in that of Irvington.

These may be, and, in fact have been, by the prosecutors, grouped under a few heads or points.

First: That an application was made at the end of the petitioners' case to dismiss the petition because of lack of proof to support it and

That the causes of the trolley company and the bus company be severed and each acted upon separately. Such motions were not determined at the time made and have not been passed upon or determined at any time and this was error.

With this we do not agree. The fact that the board proceeded to a determination of the matter was tantamount to a denial of the motions and lack of the mere formality of expressly denying the same certainly worked no prejudicial harm to the prosecutors if a denial of the motions was justified.

And we think such action with respect to these motions was correct.

Laying aside, for the moment, the question as to whether or not the increase of fares resulting from the re-zoning of the routes was justified by the facts before the board (which matter will be disposed of under a subsequent point) we find the proofs before the board fully justified its finding and order in respect thereto and we further find that a proper and satisfactory conclusion could best be reached (and perhaps only

so reached) by considering the matters as jointly affecting both classes of utilities, namely, trolley and bus lines.

Second: That the board had no jurisdiction to hear and determine an application for co-ordinating, as to fare zones, two utilities operated by independent corporations and particularly to co-ordinate the utilities in question so far as they serve Irvington, Roselle Park and Kenilworth where the evidence shows that one utility (bus transportation) is receiving a fair return.

The prosecutors argue that, under the statute, the board is not given such power and therefore it has no power to make rates simply for the purpose of protecting the railway company from the competition of the newer and cheaper transportation.

If this was purely a rate case, which it is not, and the judgment of the board sustains our conclusion in that direction, the contention of the prosecutors must be said to be unsubstantial as measured by recent expressions of our courts. *Hunter* v. *Public Utility Commissioners*, 1 *N. J. Mis. R.* 408; *Motor Transport Co.* v. *Board*, 6 *N. J. Adv. R.* 582; *affirmed*, No. 109 May term (*Court of Errors and Appeals*), 1928; *Fornarotto* v. *Board*, 6 *N. J. Adv. R.* 1631.

Third: The next ground urged, and argued at great length and with much persistence, is that the board could not legally justify its finding without a valuation of the used and useful property of the transportation company.

We find that this contention is fully answered, adversely to the prosecutors, in *Public Service Gas Co.* v. *Board of Public Utility Commissioners*, 84 *N. J. L.* 463; 87 *Id.* 581; *O'Brien* v. *Public Utility Board*, 92 *Id.* 46, 587.

In the light of the rules laid down by these cases we hold that a valuation of the properties of the transportation company was not an absolute necessity or legal pre-requisite to a finding by the board and further that its conclusion respecting the re-zoning, or co-ordinating of the zones of the trolley and bus company, with the resulting increased revenue to either, or both, was warranted by the proofs and did not produce an unfair rate as to either company or the public.

It may be remarked that the trend of adjudication by the board of public utility commissioners approved by this court is that every reasonable effort should be made to maintain the service by trolley as well as by bus. *Hunter* v. *Public Utility Commissioners, supra; Motor Transport Co.* v. *Board, supra,* and *Fornarotto* v. *Board, supra.*

This, however, is upon the presently existing theory that it is wise and prudent that both means of transportation should be preserved and maintained for the benefit of the public.

Whether or not this is wise and economical depends largely upon what the future may demonstrate.

For the present, at least, such policy seems to be wise and prudent. The future will determine the wisdom or fallacy of it.

As was said by Mr. Justice Swayze in this court in *Public Service Co.* v. *Public Utility Board, supra:* "Fixing rates by public authority may secure to each individual the advantage of collective bargaining by or in behalf of the whole body of consumers and result in such rate as might fairly be supposed to result from free competition if free competition were possible. A just and reasonable rate, therefore, is necessarily rather a question of business judgment than one of legal formula, and must often be tentative, since the exact result cannot be foretold."

In *Motor Transport Co.* v. *Board, supra,* we said : "Now, it is to be borne in mind that it is the duty of the board to protect from unreasonable and destructive competition existing facilities which are actually serving the public, so that the public may continue to have the benefit of such service." Citing *Hunter* v. *Board, supra.*

And further, we said, in *Fornarotto* v. *Board, supra,* as to the power and duty of the board * * * that where there is evidence before the board * * * to justify their action and to reasonably support the same, in view not only of the direct evidence before it but in view of the entire situation of the case under the legislation which has committed the determination of these questions to the board, this court will not disturb their adjudication."

This would seem to cover all the grounds urged by the prosecutors other than that the offer of the agreement of consolidation of the Public Service Railway Company into the Public Service Co-ordinated Transport was not relevant to the issue.

We consider the question raised as being entirely immaterial to the matter before us.

So far as the proceedings under review are concerned the board considered the two companies as entirely separate and distinct and as separate corporate entities, and this was proper and warranted by the facts. Some objection is made to the municipalities as proper parties to these proceedings.

In *Public Service Gas Co.* v. *Public Utility Commissioners,* and *O'Brien* and *City of Trenton* v. *Public Utility Commissioners, supra,* this question seems not to have been raised by any of the parties, nor the court,

Here it is not necessary to be decided because, in each case, a member of the public is joined as a party prosecutor.

We conclude that the order or judgment of the board of public utility commissioners should be affirmed and the writs of *certiorari* dismissed, with costs.